Mr. Zott, whenever you're ready. Did I butcher your name, or is that how we had to pronounce your name? George Chusey, Your Honor. Chusey. Thank you. May it please the Court, I'm assuming the Court is familiar with the facts in this case. The question being presented to the Court is, as it is in a lot of cases, what are the constraints on the Board when reversing an administrative judge's mitigation of penalty, when that mitigation decision is specifically based on the credibility and demeanor of the appellant? Well, I understand that that's an issue, but I guess I'm not sure what relevance it necessarily has to the outcome in this case, because credibility, the kind of credibility determinations we're talking about are really demeanor-based. It's like, you're sitting in front of me, and I'm watching you, and I'm listening to you. But wasn't the significant evidence that the judge, that the A.J. relied on here documentary evidence and not testimonial evidence? She indicated in her decision that she relied on credibility and demeanor. She specifically said that Mr. Scheinman was remorseful and acknowledged his mistakes in his time in attendance. She may have said that, but really, when she relied on his remorsefulness, wasn't she citing documentary evidence for that? No, Your Honor. She was citing his testimony at the hearing. She indicated that he was consistent in his testimony regarding what he understood to be the constraints on his performance and conduct, beginning with what he told the investigator in February of 2014. Can you point us to the decision that you're referring to, where she talks about his testimony? Because I... Yes, Your Honor. I believe it's... I believe it's...  Your Honor, she, um... It'd be 36 to 37. Thank you. Yes, on 36, he says his testimony regarding his work hours was corroborated. He... But this was with respect to the first charge, wasn't it? Yes, Your Honor. The first charge, which was rejected by the judge and the board, that was the charge of falsification. What we're talking about here is the charge of misusing sick leave. Right. So, the board's opinion here, which sustained the removal, was based exclusively on charge two. So, you began by talking about how the board kind of did more than it should have done with respect to overturning the A.J.'s credibility. And if all of that deals with charge one, it's not really relevant to our decision, is it? Well, it's relevant insofar as the administrative judge specifically based the mitigation, in addition, I believe, to his consistent testimony. But he based the mitigation decision on the fact that, number one, he had, of the 29 specifications of misusing sick leave, he was found to have abused it only eight times. Of those eight times, three of them, seven of them, were approximately four years before his removal. Okay, but all of that doesn't go to your first point, does it, which is that the board didn't have the authority or the ability to second-guess her credibility determinations. Those are decisions and analyses based on the cold record, right? Yes, well, I'll accept your characterization of it, Your Honor. But the fact remains that for the charges that were sustained, the board is still charged with deciding whether or not the penalty imposed by the agency is the maximum reasonable penalty for the charges that were proven. Right. Right. Excuse me, let me ask you. You certainly can challenge what the board did here, but it doesn't seem to me that you have a basis for a purifoy argument, which is what you mount in your brief. I mean, it doesn't seem to me that in reinstating the penalty of removal, the board in any way went against the A.J.'s credibility determinations or demeanor determinations. In fact, you read the opinion of the board, it seems to go out of its way to endorse at the A.J.'s credibility determinations. Well, it says it does. But in the final analysis, it doesn't. And in pure... No, but it looked to me like what the board said was you didn't follow the proper approach for determining rehabilitation here. We accept everything you've found about his credibility, but Factor X and Factor Y, contrary to what you said, weigh against rehabilitation. Yes, but Factor X and Factor Y, his failure to admit that he engaged in misconduct, and his lack of remorse for engaging in the misconduct, are factors which the board has specifically rejected. I provided the court on January 16th with the board's decision on January 12th in the Chen case. And in the Chen case, at footnote 8, the board specifically said that it is improper to base a penalty determination on a failure to admit misconduct or a lack of remorse. And for that, they cited a 1994 decision by the board itself. But the board made a finding on A13 that talks about his admissions only concern the unproven misconduct set forth in the falsification charge. The appellant has never owned up to his misuse of sick leave or expressed any remorse for his lack of candor in the matter. And I don't think there's anything that the ALJ found, the AJ found, that was inconsistent with this, right? So the board did make a finding about that. You know, I assume you disagree, but I don't know the basis. In Mr. Scheinman's response to the proposal, to the proposed removal, on page 132 of the appendix, he specifically says that he has, when he learned from the investigator a year before his removal, that his treatment of time and attendance was inappropriate, he stopped. He stopped engaging in that kind of conduct. And for the year following his meeting with the investigator, he complied with all of the time and attendance requirements that were imposed upon him. And on page 132, he says he is very sorry for his breaches of those requirements, however inadvertent they may have been. Let me add, Your Honor, even if the court were to decide that he was appropriately disciplined for the charge that the agency leveled against him, which is making false or misleading statements, the penalty of removal was not applicable to him. It was not one of the options that the agency made available to itself. In 2012... You're talking about the guidelines now. I'm talking about the penalty guidelines. Don't the guidelines have enough fluidity in them to allow for deviations from those guidelines? And there were a lot of findings here and testimony about the loss of trust, the importance of the position, not just for public trust, but also because he worked remotely, and so you have to be willing to do independence. So are you saying that under those guidelines, they would preclude the agency under any circumstances from taking removal action? Not under any circumstances, possibly, Your Honor, but here, where for the year before his removal, he had demonstrated his ability to comply with those requirements. The maximum reasonable penalty in 2012 was a reprimand to a 20-day suspension. He had demonstrated... The A.J. found that he had... And this is similar to the Moreno case, I believe. In Moreno, the board reimposed a penalty of removal, even though the employee who had been removed for excessive absence had eventually been returned to work in a part-time capacity and had no further issues with her attendance. The board nevertheless reinstated removal as a penalty, and this court remanded because the board had not specifically or sufficiently addressed the capacity for rehabilitation. That's what we're talking about here. The issue... The purpose of discipline is to ensure that it deters further misconduct. The Scheinman in this case had demonstrated that once he was aware that he was engaging in misconduct, he rehabilitated himself. There was no further need. The maximum penalty, I believe, under those circumstances, is what the agency itself determined in 2012 was a 20-day suspension. Both the board and the administrative judge were relying on the 2007 version of the penalty guide, even though in its decision to remove Mr. Scheinman, the agency cited the 2012 penalty guide, and that's at page 133 of the appendix. Is it your argument that the A.J. failed to consider the timing of Scheinman's admission of errors and the limited scope of his regrets? No, I don't believe... Is it failure to reconsider or arriving at the wrong decision after consideration? Your Honor, I don't believe... The board has already held that it is the agency that is improper when considering a penalty to consider remorse or the lack of admission. I get that, but this is not a case where the A.J. failed to consider all of the issues before it. That's true. She did consider all of that. She considered his nine years of successful performance. She considered his lack of any earlier discipline, and she considered the fact that after he was informed that he was engaging in... Did she consider his misuse of sick leave for golfing? She did consider that, and she said it was... She agreed with the agency that it was serious, and the only question was what would be the maximum reasonable penalty for that conduct, where he was removed for 29 specifications, and she approved and the board approved only eight of them. And those were much earlier, and he had already adjusted to the requirements as he understood them. Okay, you're willing to rebuttal, so I'm going to hear from the other side. Thank you, Justice. Good morning, Your Honors. May it please the Court. Counselor, is this a case that we should remand because A.J. failed to consider all of the issues before it? No, Your Honor. In fact, it's unnecessary because the board definitively reconsidered the issues that it felt it needed to reweigh because of gaps in the A.J.'s decision. Specifically, the board reconsidered the seriousness of the offense, given that not all specifications in Charge 2 were sustained, and the board also reconsidered how the factors related to rehabilitation should be weighed. So the board has already done that work of reweighing the facts as necessary. What about the guidelines? I mean, you have to say, you have to establish that that was harmless error because there was an error here. I agree it's an error, Your Honor, but it is harmless, and there are two reasons for that. First, the agency considered both the 2007 and 2012 guidelines in its removal decision. That's already clear in the record. Second, to the extent... The agency considered both of them, the new ones and the old ones? Indeed. It cited specifically in the deciding officials removal letter that... But where do we see that with respect to the... referring to the new regulations? If you'll look at the record at page 133, Your Honor, say the second up from the bottom paragraph on this page, this is the February 3rd, 2015,     If you look at the record at page 133, Your Honor, in the deciding officials removal letter, it states, In deciding what penalty is adequate and appropriate in this case, I have considered the evidence and all relevant factors, including the Douglas factors, and the complete IRS Manager's Guide to Penalty Determinations Penalty Guide, document 11500, dated 8-2007, and revision dated 8-2012. So what about on appendix 15, the board talks about the Guide to Penalty Determinations, and it's got some citations. Those are all to the earlier guide, are they not? That's correct, Your Honor. The board cited only to the 2007 penalty guide. Okay, so how is that harmless there, if that's what the board relied on? Your friend described that penalty guide as setting a ceiling, which is below removal for these kinds of penalties. So how does that constitute harmless there? For the very reasons that I think the court alluded to in asking opposing counsel, which is that it does not set a ceiling. In fact, there's quite a lot of room within the penalty guide for the deciding official to depart from the recommended penalties. And specifically, I could direct the courts to the section of the 2012 penalty guide, which states, appendix 78, which states, more severe penalties, including removal, may be appropriate even for a first offense. Further, at appendix 77, it states, the range of penalties should serve as a guide only only is in all caps, not a rigid standard. Deviation from the guide are permissible, and greater or lesser penalties than suggested may be imposed. Now, what the board highlighted from the guide on appendix 15 is the, quote, persons in positions of trust or who deal directly with taxpayers can be held to higher standards. Does that language remain in the 2012 guide? Not as such, Your Honor, but... continues to be applicable. I agree, but there is a version of that language that I think we could argue has the same effect. So if you look at appendix 104, it states, publicity or even the possibility of publicity that could have a negative impact on the reputation of the agency is a factor that may be considered to enhance a penalty. In this case, the public-facing position, such as the one Mr. Scheinman occupied, is one in which negative publicity could be a problem. And there's... And the board particularly found that there was an opportunity here for press matters coming to the forefront. Indeed, it did. And, Your Honor, the agency deciding official testified at length about this concern, you know, stating that he was deeply worried about the public's reception of any examples of the IRS paying an employee with their tax dollars to play golf. He also said that he felt it very much damaged the reputation of the service and the federal government's reputation for ethics, and that the media would, quote, have a field day with any such examples. Okay. So I have two other questions for you. They're not necessarily related. One is... But they go to the arguments your friend made. One was that he had an opportunity and the agency had opportunity to see after these charges were leveled, he had a year or two or whatever where he didn't repeat the same offenses. And why shouldn't we consider that and give him credit for that? The second question, which I've forgotten for now, so why don't you deal with that one? To answer your first question, Your Honor, it's very simple. He reformed his behavior temporarily while... After the time he was caught and confronted with the behavior and before a final removal action was taken. And that kind of behavior, where someone has been confronted with the improper conduct and is under the sort of Damocles for a penalty for that conduct, cannot possibly be or reasonably be assumed to demonstrate what his behavior would be like had he been returned to the agency after the completion of any such discipline. Okay. I remembered the second question, which is your friend also referred to the fact... We know there were two charges, and one was not sustained. And then even with respect to the charge that was sustained, it was only a small number. Eight out of a hundred... I mean, a small number of the specifications within that charge were sustained and the others were thrown out. Why doesn't that mismatch in terms of the charges that were supportive of the removal in the first instance and the extent to which they were whittled down substantially? Why doesn't that lead us to think that the remedy, therefore, should be whittled down as well? It's a fair question, Your Honor. I would say there's three reasons why. I don't think that's a persuasive one. First is, while there were 29 specifications originally under charge two, which was sick leave, the eight specifications which the court found were substantiated were substantiated over the course of five years. So on eight occasions, this employee went to the golf course and told his employer that he was sick. And as the administrative judge concluded, that simply isn't a credible argument. No one could genuinely believe that. So I think that first point is that while eight is fewer than 29, eight is still a lot considering the conduct at issue. The second point I would make is that in the agency's determination of the penalty here, it made it clear that the removal penalty was appropriate either for charge one or for charge two. So the agency had clearly thought that overall, the sick leave conduct was egregious enough to warrant removal. And third, the agency testified about this issue and the deciding official specifically said that even quote, a few examples of this kind of behavior would be enough to cause significant concern for the agency. Both because Mr. Simon was in a position of representing the agency to the community in his work as an appraiser, in his work with tax payers and because it's specifically the kind of thing that had the press become aware of would have damaged seriously the reputation of the agency. And they seemed also to rely on the fact that there, and this is more ubiquitous now, which is the remote work environment which I assume comes with the lack of supervision and the greater need for trust. That's exactly right. The agency testified about that issue as well. Mr. Simon didn't have a local supervisor. He appeared at the physical office location in Hawaii when he felt he needed to but mostly was allowed and trusted to telework and as the deciding official testified he did not feel that he could regain the trust that was lost in Mr. Simon when over such a long period of time, Mr. Simon was taking advantage of sick leave to engage in a sport. Thank you. Will we store three minutes for rebuttal? Just briefly, Your Honor. Why would the agency cite to the 2012 penalty guide if not for the penalty itself? And if, as the government says, while the agency reserved for itself the ability to deviate from the penalty guide whenever it deemed it sufficient, what's the purpose of the penalty guide? What would happen if we were to decide to send this back due to an error relying on the outdated penalty guide? Isn't it reasonable that the agency would look at the revised, the updated guide and come out with the same decision? Well, except possibly. But I would suggest that the first offense, which is all he was the agency didn't accuse him of anything more than a first offense. The first offense for false or misleading statements in 2012 was a reprimand to a 20-day suspension. With respect to the rehabilitation, Ms. Fleming cited page 104 of the appendix. And with respect to potential for rehabilitation, paragraph 9 on page 104 of the appendix specifically says, an employee who ceases misconduct after being warned may show potential for rehabilitation. That is exactly what happened here. The agency's own penalty guide says that what Mr. Scheinman did should have encouraged the agency itself to find rehabilitation. I also want to say with respect to what the public would understand, there's no allegation that Mr. Scheinman was not entitled to be out on the days when he played golf. His determination was he wasn't well enough to work. So he took sick leave. The agency says that was wrong. But there's no question that he could have chosen annual leave. Any member of the public watching Mr. Scheinman play that's not the case before us. You're painting a scenario They wouldn't have taken action against him for taking annual leave. But one of the aggravating factors is the agency says the public would know that somehow he's abusing leave. The public would not know. The public was not in a position to know. The only one who knew, who would have known, was his supervisor. And as soon as Mr. Scheinman went to his supervisor in February 2014, after being told by the investigator that he was abusing leave, he asked his supervisor what was required and subsequently there were no further incidents. Which is exactly what the penalty guide anticipates as being rehabilitation potential. Which penalty guide? The 2012 penalty guide on page 104 of the appendix. Thank you. Thank you.